IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Criminal Action No. H-04-442 |
| | § | |
| OTUKAYODE ADELEKE | § | |
| OTUFALE, ISAAC SIMEON | § | |
| ACHOBE, CHICHA KAZEMBE | § | |
| COMBS, ANDRE DION BROWN, | § | |
| JOHN DAVID WILEY, III, | § | |
| ANTHONY DWAYNE ESSETT, | § | |
| and ERIC EARL CRAFT. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

\_\_\_\_\_Defendants Otukayode Adeleke Otufale ("Otufale"), Isaac Simeon Achobe ("Achobe"), Chicha Kazembe Combs ("Combs"), Andre Dion Brown ("Brown"), John David Wiley, III ("Wiley"), Anthony Dwayne Essett ("Essett"), and Eric Earl Craft ("Craft") (collectively "Defendants") were convicted by jury on all counts in the Second Superseding Criminal Indictment. Defendants consented to the Court determining forfeiture sought in the Second Superseding Criminal Indictment. The Court has reviewed the evidence, the post-trial submissions of the parties, the parties' argument at the November 28, 2005 hearing, and the applicable law. The Court now enters the following findings of fact and conclusions of law. Any finding of fact that should be construed as a conclusion of law is hereby adopted as such. Any conclusion of law that should be construed as a finding of fact is hereby adopted as such.

<u>FINDINGS OF FACT</u>

<u>Background</u>

1.  Hydrocodone is a Schedule III controlled substance.  Hydrocodone products include vicodin, lortab and lorcet.

2.  Promethazine with codeine ("promethazine") is a Schedule V controlled substance.

3.  At all times relevant to this case, Callie Hall Herpin ("Herpin") was a medical doctor licensed to practice medicine in the State of Texas.

4.  About October 2002, Herpin opened a medical practice at 6440 Hillcroft, Houston, TX.

5.  Herpin testified that after opening her medical practice she began to sell prescriptions outside the scope of a physician's professional practice and not for a legitimate medical purpose.  Essentially, Herpin sold prescriptions for promethazine and hydrocodone to individuals ("customers") who did not need these drugs for a legitimate medical purpose.

6.  Herpin frequently sold prescriptions for a pint (16 ounces) of promethazine and 100 hydrocodone tablets, knowing that the individual buying the prescription did not have a medical need and thus such

prescription was outside the scope of professional practice and not for a legitimate medical purpose.

7.   Etta Williams, Karen Williams, Angela Specht, and Taraunique Eze worked for Herpin at the medical clinic.  All of Herpin's employees were involved in unlawfully selling prescriptions to customers.

8.   Herpin and her employees would also sell customers multiple prescriptions issued in the names of fictitious individuals.  Customers who purchased these prescriptions would receive lists of names that contained same names written on the prescriptions.  In addition to names, the lists also contained fictitious addresses and dates of birth.  The purpose of these lists was to provide pharmacists with information necessary to create patient profiles.

9.   Testimony indicated that, after filling Herpin's prescriptions, the promethazine and hydrocodone would then be sold on the street to individuals who did not have prescriptions for these substances.

10.   During the relevant time period, Herpin sold approximately 17,086 prescriptions for promethazine and hydrocodone.

11.   Herpin sold prescriptions for prices ranging from $75-$300 depending on her relationship with the customer.

3

a.  An undercover Houston Police officer who visited Herpin's office paid $250 and $300 for prescriptions during two visits.

12.  Trial testimony indicated that, if asked, Herpin's employees informed customers that American Choice Home Health Care Pharmacy, Med Stop Pharmacy, Mason Road Pharmacy, I-10 East Pharmaceutical Services, Inc., and Stella Link Pharmacy would fill Herpin prescriptions.

13.  During the conspiracy, these pharmacies dispensed a combined total about 20,000 pints of promethazine and 1,765,000 dosage units of hydrocodone under Herpin's prescriptions.

14.  Defendant Sharon Boutte ("Boutte") purchased prescriptions from Herpin.

15.  Defendant Omar Fahie ("Fahie") purchased prescriptions from Herpin.

16.  Defendants Eric Craft ("Craft") and Will Bailey, III ("Bailey") purchased prescriptions from Herpin.

Prior Criminal Proceedings

17.  Counts one through eleven of the Second Superseding Indictment charged Otufale, Achobe, Combs, Brown, Wiley, Essett, and Craft of unlawfully distributing and dispensing controlled substances and conspiring to do the same, in violation of 18 U.S.C. §§ 841 and 846.

4

a.  Juries convicted these defendants on all counts.

18.  Counts twelve through eighty-two of the Second Superseding Indictment charged Otufale, Achobe, Combs, Brown, Wiley, and Essett of money laundering offenses in violation of 18 U.S.C. §§ 1956 and 1957. A jury convicted these defendants of all money laundering offenses charged.

19.  The Second Superseding Indictment included a provision entitled "Notice of Criminal Forfeiture."

a.  The notice of forfeiture provided that, with respect to the money laundering offenses, the United States sought "all property, real and personal, involved in such offense, or any property traceable to such property. . . ."

b.  The notice further instructed that, with respect to the controlled substances violations and the conspiracy related thereto, the United States sought "(1) any property constituting, or derived from, any proceeds obtained, directly or indirectly as the result of such violation; and (2) any property used or intended to be used, in any manner or part, to commit, or facilitate the commission of such violation."

c.  Moreover, the notice included as property subject to forfeiture:

Real property located at 13711 Cypress Pont Circle, Cypress, Texas 77429, together with all buildings, appurtenances, improvements, fixtures, attachments, and easements, and more particularly described as lot 6, Block 4, Lakewood Oak Estates, Sec. 2, Harris County, Texas." and

Real property located at 3106 Spring Ridge, Manvel, Texas 77578, together with all buildings, appurtenances, improvements, fixtures, attachments, and easements, and more particularly described as Lot 4, Block 2, Silvercreek, Sec. 3 (AO415 ACH &B), Brazoria County, Texas."

d.    Finally, the notice indicated the United States sought "[a]pproximately $4,000,000.00 in United States currency."

20.    Defendants waived a jury determination of forfeiture and consented in open court to allowing the Court to determine forfeiture related to the offenses for which they were convicted.

Defendant Isaac Simeon Achobe

21.    At all times relevant to the instant proceeding, Defendant Isaac Simeon Achobe was a registered pharmacist licensed in the state of Texas. Achobe was the owner and pharmacist-in-charge of American Choice Home Health Care Pharmacy ("American Choice") located at 8449 West Bellfort, Houston, Texas.

22.    Herpin and Achobe entered into the conspiracy when they engaged in a

6

discussion of the practice of pain management.

23.   Achobe informed Herpin that pain management is a lucrative business and instructed that pain management doctors write prescriptions for vicodin and promethazine, which customers consume in order to achieve an altered mental status.

    a.   Achobe recommended Herpin speak with other physicians, who were not indicted in the instant case, about the practice of pain management.

    b.   Achobe had ceased filling prescriptions for certain pain management doctors when he suggested Herpin speak with such doctors about their practice.

24.   Achobe referred customers to Herpin after she opened her office.

25.   Although Achobe did not fill prescriptions from lists, Achobe permitted individuals, such as Fahie and Boutte, to pick up prescriptions written for other individuals.

26.   Achobe sold pints of promethazine to customers for approximately $65 each.

27.   Achobe sold 100 count bottles of hydrocodone for approximately $50 per bottle.

28. In June 2003, an undercover Houston Police Officer went to American Choice seeking to have a prescription written by Herpin filled, but Achobe did not fill the prescription.  Rather, Achobe indicated the pharmacy did not have any promethazine in stock.

29. Achobe contacted Herpin and expressed concern over the quantity of her prescriptions for hydrocodone and promethazine.  However, Achobe continued to fill Herpin prescriptions after this communication.

30. During the course of the conspiracy, Achobe filled prescriptions written by Herpin knowing that the prescriptions were written by Herpin outside the scope of a medical doctor's professional practice and not for a legitimate medical purpose.

    a.    During the conspiracy, Achobe, in filling Herpin's prescriptions, distributed 264 pints of promethazine.

    b.    During the conspiracy, Achobe, in filling Herpin's prescriptions, distributed approximately 168 bottles of hydrocodone that contained 100 pills each, knowing that the prescriptions were written by Herpin outside the scope of a medical doctor's professional practice and not for a legitimate medical purpose.

31. Achobe, during the course of the conspiracy, generated approximately

$17,160 in revenue filling Herpin's prescriptions for promethazine. This amount reflects sales of 264 pints of promethazine sold at $65 a pint.

32.   Achobe, during the course of the conspiracy, generated approximately $8,400 in revenue filling Herpin's prescriptions for hydrocodone. This amount reflects sales of 168 bottles (100 count) of hydrocodone sold at $50 a bottle.

33.   Achobe, during the course of the conspiracy, generated approximately $25,560 in revenue filling Herpin prescriptions for both hydrocodone and promethazine, knowing that the prescriptions were written by Herpin outside the scope of a medical doctor's professional practice and not for a legitimate medical purpose.

34.   The jury found beyond a reasonable doubt $6,860.60 (counts 20-25 of the Second Superseding Indictment) was involved in money laundering by Achobe. These findings include:

a.   Count 20 - $1,050.60

b.   Count 21 - $1,030.73

c.   Count 22 - $ 1,477.14

d.   Count 23 - $1,000.55

e.   Count 24 - $1,169.04

   f.  Count 25 - $1,132.54

<u>Defendants Chicha Kazembe Combs and Andre Dion Brown</u>

35. At all times relevant to the instant proceeding, Defendant Chicha Kazembe Combs was a registered pharmacist licensed in the state of Texas.

36. At all times relevant to the instant proceeding, Defendant Andre Dion Brown was a registered pharmacist licensed in the state of Texas.

37. Combs and Brown were co-owners and pharmacists at Mason Road Pharmacy ("Mason Road"), which is located at 8229 South Mason Road, Katy, Texas.

38. Mason Road charged approximately $70 per pint of promethazine.

39. Mason Road charged approximately $55 per 100 count bottle of hydrocodone.

40. Combs and Brown both filled Herpin prescriptions for promethazine and hydrocodone.

41. Mason Road began filling Herpin prescriptions on February 17, 2003.

42. Brown filled Herpin prescriptions with corresponding lists.

  a. On June 20, 2003, Brown filled 30 Herpin prescriptions in names that matched those found on a list at Herpin's office.

10

b.    On June 26, 2003, Brown filled 25 Herpin prescriptions in names that matched those found on a list at Herpin's office.

43.   Combs filled Herpin prescriptions with corresponding lists.

a.    On July 1, 2003, Combs filled 10 Herpin prescriptions in names that matched those found on a list at Herpin's office.

b.    On August 5, 2003, Combs filled 10 Herpin prescriptions in names that matched those found on a list at Herpin's office.

44.   Boutte brought Herpin prescriptions to Mason Road to have them filled. These included prescriptions presented with corresponding lists.

45.   During the course of the conspiracy, Combs and Brown filled prescriptions written by Herpin knowing that the prescriptions were written by Herpin outside the scope of a medical doctor's professional practice and not for a legitimate medical purpose.

a.    During the conspiracy, Combs and Brown, in filling Herpin's prescriptions, distributed 2,036 pints of promethazine.

b.    During the conspiracy, Combs and Brown, in filling Herpin's prescriptions, distributed approximately 1,836 bottles of hydrocodone that contained 100 pills each, knowing that the prescriptions were written by Herpin outside the scope of a

11

medical doctor's professional practice and not for a legitimate medical purpose.

46.  Combs and Brown, during the course of the conspiracy, generated approximately $142,520.00 in revenue filling Herpin's prescriptions for promethazine. This amount reflects sales of 2,036 pints of promethazine sold at $70 a pint.

47.  Combs and Brown, during the course of the conspiracy, generated approximately $100,980.00 in revenue filling Herpin's prescriptions for hydrocodone. This amount reflects sales of 1,836 bottles of hydrocodone sold at $55 a bottle.

48.  Combs and Brown, during the course of the conspiracy, generated approximately $243,500.00 in revenue filling Herpin prescriptions for both hydrocodone and promethazine, knowing that the prescriptions were written by Herpin outside the scope of a medical doctor's professional practice and not for a legitimate medical purpose.

49.  The jury found beyond a reasonable doubt $169,038.02 (counts 26-42 of the Second Superseding Indictment) was involved in money laundering. These findings include:

i.     Count 26 - $5,601.78

12

    ii.      Count 27 - $2,742.90

    iii.     Count 28 - $2,294.40

    iv.     Count 29 - $2,303.37

    v.      Count 30 - $5,000.00

    vi.     Count 31 - $5,000.00

    vii.    Count 32 - $1,96.80

    viii.   Count 33 - $11,438.42

    ix.     Count 34 - $32,258.45

    x.      Count 35 - $40,561.90

    xi.     Count 36 - $8,000.00

    xii.    Count 37 - $7,000.00

    xiii.   Count 38 - $9,890.00

    xiv.   Count 39 - $9,890.00

    xv.    Count 40 - $12,000

    xvi.   Count 41 - $8,000.00

    xvii.  Count 42 - $5,060.00

50.    Both Combs and Brown had signatory authority for relevant Mason Road

bank accounts.

Defendant Otukayode Adeleke Otufale

51.    At all times relevant to the instant proceeding, Defendant Otukayode Adeleke Otufale was a registered pharmacist licensed in the state of Texas.  Otufale  was the sole owner and pharmacist-in-charge of Med Stop Pharmacy ("Med Stop"), located at 5901 Hillcroft, Houston, Texas.

52.    Med Stop charged approximately $75 per pint of promethazine.

53.    Med Stop charged approximately $50 per 100 count bottle of hydrocodone.

54.    Herpin met Otufale when he visited Herpin's office in December 2002.

55.    Otufale offered to send customers to Herpin's office.

56.    After Otufale's visit, more than 20 individuals per day visited Herpin's office  and instructed they had been referred by Otufale.

57.    Otufale filled Herpin prescriptions that had corresponding lists of fictitious patients.

    a.    Otufale allowed Fahie, Craft, Bailey, James Bosewell, Taraunique Eze, Karen Williams, and Etta Williams to fill Herpin prescriptions from lists.

    b.    On March 25, 2003, Otufale filled 25 Herpin prescriptions in names that matched those found on a list at Herpin's office.

    c.    On July 9, 2003, Otufale filled 30 prescriptions in names that

14

matched those found on a list at Herpin's office.

58. On May 7, 2003, an undercover Houston Police Officer presented Otufale with a Herpin prescription for promethazine. Otufale filled the prescription and charged the officer $75.

59. Otufale agreed to sell Etta Williams promethazine without pharmacy labels.

60. In May 2003, Otufale filled Herpin prescriptions amounting to 2,552 pints of promethazine and 473,000 units of hydrocodone . This includes 604 Herpin prescriptions filled on May 23 and 100 prescriptions filled on May 19.

61. During the course of the conspiracy, Otufale filled prescriptions written by Herpin knowing that the prescriptions were written by Herpin outside the scope of a medical doctor's professional practice and not for a legitimate medical purpose.

   a. During the conspiracy, Otufale, in filling Herpin's prescriptions, distributed 10,841 pints of promethazine.

   b. During the conspiracy, Otufale, in filling Herpin's prescriptions, distributed approximately 6,182 bottles of hydrocodone that contained 100 pills each, knowing that the prescriptions were

15

written by Herpin outside the scope of a medical doctor's professional practice and not for a legitimate medical purpose.

62. Otufale, during the course of the conspiracy, generated approximately $813,075.00 in revenue filling Herpin's prescriptions for promethazine. This amount reflects sales of 10,841 pints of promethazine sold at $75 a pint.

63. Otufale, during the course of the conspiracy, generated approximately $309,100.00 in revenue filling Herpin's prescriptions for hydrocodone. This amount reflects sales of 6,182 (100 count) bottles of hydrocodone sold at $50 a bottle.

64. Otufale, during the course of the conspiracy, generated approximately $1,122,175 in revenue filling Herpin prescriptions for both hydrocodone and promethazine, knowing that the prescriptions were written by Herpin outside the scope of a medical doctor's professional practice and not for a legitimate medical purpose.

 a. The jury found beyond a reasonable doubt $75,793.48 (counts 12-19 of the Second Superseding Indictment) was involved in money laundering. These findings include:

  i. Count 12 - $15,000.00

16

    ii.      Count 13 - $10,000.00

    iii.     Count 14 - $9,533.34

    iv.     Count 15 - $10,858.41

    v.      Count 16 - $14,335.89

    vi.     Count 17 - $6,677.84

    vii.    Count 18 - $5,503.00

    viii.   Count 19 - $3,885.00

65.    Otufale had signatory authority for the relevant accounts.

## Defendants John David Wiley, III and Anthony Dwayne Essett

66.    At all times relevant to the instant proceeding, Defendant John David Wiley, III was a registered pharmacist licensed in the state of Texas.

67.    At all times relevant to the instant proceeding, Defendant Anthony Dwayne Essett was a registered pharmacist licensed in the state of Texas.

68.    Wiley and Essett were co-owners and pharmacists at I-10 East Pharmaceutical Services, Inc. ("I-10 East") in Houston, Texas.

69.    I-10 East sold pints of promethazine to customers for approximately $70 each.

70.    I-10 East sold 100 count bottles of hydrocodone for approximately $55 per bottle.

17

71.   Essett visited Herpin in December 2002 and informed Herpin that I-10 East would fill her prescriptions.  He also instructed Herpin that he could send her customers.

72.   From January until June 2003, Fahie brought Herpin prescriptions with corresponding lists to 1-10 East, where Wiley and Essett would fill such prescriptions.

   a.   Fahie would bring between 25 and 100 prescriptions with corresponding lists to I-10 East every week or every other week.

   b.   On one occasion, Fahie paid $12,000 in cash for Herpin prescriptions filled at I-10 East.

   c.   Fahie stopped taking Herpin prescriptions to I-10 East after he saw police officers at the pharmacy.  However, he was instructed by either Wiley or Essett that he could continue to fill prescriptions at I-10 East.

73.   Wiley filled Herpin prescriptions, including those with corresponding lists.

74.   Essett filled Herpin prescriptions, including those with corresponding lists.

   a.   On March 30, 2003, Essett filled 30 prescriptions in names that

18

matched those found on a list at Herpin's office.

75.   Craft filled prescriptions with lists at I-10 East.

76.   Wiley told Defendant Darryl Armstrong ("Armstrong"), a pharmacist at Stella Link Pharmacy, that Craft filled a number of prescriptions.

77.   Wiley sent customers to Armstrong at Stella Link Pharmacy.

   a.   One hundred six names appear on dispensing reports for both Stella Link Pharmacy and I-10 East.

78.   During the course of the conspiracy, Wiley and Essett filled prescriptions written by Herpin knowing that the prescriptions were written by Herpin outside the scope of a medical doctor's professional practice and not for a legitimate medical purpose.

   a.   During the conspiracy, Wiley and Essett, in filling Herpin's prescriptions, distributed approximately 3,192 pints of promethazine.

   b.   During the conspiracy, Wiley and Essett, in filling Herpin's prescriptions, distributed approximately 2,751 bottles of hydrocodone that contained 100 pills each, knowing that the prescriptions were written by Herpin outside the scope of a medical doctor's professional practice and not for a legitimate

medical purpose.

79.     Wiley and Essett, during the course of the conspiracy, generated approximately $223,440.00 in revenue filling Herpin's prescriptions for promethazine. This amount reflects sales of 3,192 pints of promethazine sold at $70 a pint.

80.     Wiley and Essett, during the course of the conspiracy, generated approximately $151,305.00 in revenue filling Herpin's prescriptions for hydrocodone. This amount reflects sales of 2,751 bottles of hydrocodone sold at $55 a bottle.

81.     Wiley and Essett, during the course of the conspiracy, generated approximately $374,745.00 in revenue filling Herpin prescriptions for both hydrocodone and promethazine, knowing that the prescriptions were written by Herpin outside the scope of a medical doctor's professional practice and not for a legitimate medical purpose.

82.     The jury found beyond a reasonable doubt $517,314.37 (counts 43-72 of the Second Superseding Indictment) was involved in money laundering.[1]

---

[1]The Court recognizes that the money laundering amounts found by the jury exceed the amounts found by this Court subject to forfeiture under the controlled substances violations. This result stems from, for the purposes of this Order, the Court's use of only Herpin prescriptions to calculate approximate forfeiture amounts. However, the jury findings are consistent with evidence indicating Wiley and Essett generated over $1.5

These findings include:

i.      Count 43 - $11,841.83

ii.     Count 44 - $11,101.20

iii.    Count 45 - $11,051.39

iv.     Count 46 -$16,632.14

v.      Count 47 - $10,841.78

vi.     Count 48 - $7,488.17

vii.    Count 49 - $10,131.11

viii.   Count 50 - $15,674.21

ix.     Count 51 - $11,450.61

x.      Count 52 - $2,971.93

xi.     Count 53 - $9,380.00

xii.    Count 54 - $4,195.00

xiii.   Count 55 - $4,000.00

xiv.    Count 56 - $8,150.00

xv.     Count 57 - $4,820.00

xvi.    Count 58 - $5,000.00

xvii.   Count 59 - $5,000.00

---

million filling unlawful prescriptions for doctors other than Herpin.

xviii.   Count 60 - $5,000.00

xix.   Count 61 - $8,662.00

xx.   Count 62 - $2,000.00

xxi.   Count 63 - $5,000.00

xxii.   Count 64 - $7,625.00

xxiii.   Count 65 - $2,000.00

xxiv.   Count 66 - $8,400.00

xxv.   Count 67 - $26,140.00

xxvi.   Count 68 - $26,140.00

xxvii.   Count 69- $41,876.00

xxviii.   Count 70 - $41,876.00

xxix.   Count 71 - $96,433.00

xxx.   Count 72 - $96,433.00

83.   Wiley and Essett had signatory authority on I-10 East accounts.

84.   The jury additionally found Wiley guilty of counts 73-75 of the Second

Superseding Indictment, totaling $275,000.  These include:

a.   Count 73 - $40,000.00

b.   Count 74 - $95,000.00

c.   Count 75 -  $140,000.00

22

85.   The jury also found that the amounts alleged in count 73-75 were used as partial payment for Wiley's residence located at 13711 Cypress Pond Circle, Cypress, Texas.

    a.   The jury found in count 73 that on April 30, 2003, Wiley paid $40,000.00 in proceeds obtained in illegal activities to Chase Manhattan bank as partial payment for the residence located at 13711 Cypress Pond Circle, Cypress, Texas.

    b.   The jury found in count 74 that on August 25, 2003, Wiley paid $95,000.00 in proceeds obtained in illegal activities to Chase Manhattan as partial payment for the residence located at 13711 Cypress Pond Circle, Cypress, Texas.

    c.   The jury found in count 75 that on October 28, 2003, Wiley paid $140,000.00 in proceeds obtained in illegal activities to Chase Manhattan Mortgage as partial payment for the residence located at 13711 Cypress Pond Circle, Cypress, Texas.

86.   The jury additionally found Essett guilty of counts 76-82 of the Second Superseding Indictment, totaling $233,339.71.  These include:

    a.   Count 76 - $11,487.11

    b.   Count 77 - $41,876.00

    c.      Count 78 - $12,716.05

    d.      Count 79 - $22,996.92

    e.      Count 80 - $24,323.63

    f.      Count 81 - $20,000.00

    g.      Count 82 - $100,000.00

87.    The jury found in count 82 that on August 8, 2003, Essett paid $100,000 in proceeds obtained in illegal activities to Country Wide Mortgage as partial payment on the residence located at 3106 Spring Ridge, Manvel, Texas.

## CONCLUSIONS OF LAW

### Background

1.    The United States seeks forfeiture under 21 U.S.C. § 853 and 18 U.S.C. § 982.

2.    Title 21 U.S.C. § 853 governs property subject to forfeiture under the Controlled Substances Act.  It provides,

> Any person convicted of a violation of this subchapter or subchapter II of this chapter punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of state law -
> (1) any property constituting, or derived from any proceeds

24

the person obtained, directly or indirectly, as a result of such violation;

(2) any part of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of such violation.

21 U.S.C. § 853(a)(1)-(2) (2000).

3.    Section 853(c) provides "All right, title, and interest in property described in subsection (a) vests in the United States upon the commission of the act giving rise to the forfeiture under this section." 21 U.S.C. § 853(c).

a.    In other words, title vests in the United States when the act is committed. *See id.*

4.    Title 18 U.S.C. § 982 governs forfeiture related to money laundering offenses.  It provides

The court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

18 U.S.C. § 982(a)(1) (2000).

5.    The standard of proof in forfeiture proceedings is preponderance of evidence. *See United States v. Gasanova,* 332 F.3d 297, 300-01 (5th Cir. 2003)("statutorily-prescribed forfeiture is warranted upon a showing of a preponderance of the evidence.").

6.    The Government must provide notice to a defendant before a court can enter a judgment of forfeiture.  FED. R. CRIM. P. 32.2(a).

7.    "The purpose of the notice of forfeiture in the indictment is to inform the defendant that the government seeks forfeiture as a remedy. Barebones pleading suffices so long as it puts the defendant on notice that the government seeks forfeiture and identifies the assets subject to forfeiture with sufficient specificity to permit the defendant to marshal evidence in their defense." *United States v. Cauble,* 706 F.2d 1322, 1347 (5th Cir. 1983).

8.    Here, the Court determines that the Second Superseding Indictment provided legally sufficient notice of the United States' intent to forfeit property under 21 U.S.C. § 853 and 18 U.S.C. § 982.

    a.    The "Notice of Forfeiture" included in the Second Superseding Indictment provided Defendants with detailed notice of the property sought.

9.    "All proceeds obtained from unlawful conduct and property traceable to those proceeds are subject to criminal forfeiture." *United States v. Betancourt,* 422 F.3d 240, 255 (5th Cir. 2005).

10.    Under Section 853(a), "*all* property representing proceeds of drug offenses

26

is forfeitable." *Id.* (emphasis in original)(quoting *United States v. Vera,* 278 F.3d 672, 673 (7th Cir. 2002)).

11.   A requisite nexus must exist between the offense and the property sought by the United States.  FED. R. CRIM. P. 32.2(b)(1).

12.   Both  18  U.S.C.  §  982(a)(1)  and   21  U.S.C.  §  853(a)(1)  permit coconspirators to be jointly and severally liable for the amount of property involved in the conspiracy.  *United States v. Pitt,* 193 F.3d 751, 765-66 (3d Cir. 1999); *see also United States v. Edwards,* 303 F.3d 606, 644 (5th Cir. 2002)(discussing joint and several liability of forfeiture amount under RICO).

    a.   However, a defendant's forfeiture liability with respect to funds generated or laundered by co-conspirators is limited to the extent reasonably foreseeable to the defendant.  *See United States v. Hurley,* 63 F.3d 1, 22 (1st Cir. 1995) (examining RICO).

13.   Here, the Court determines the extent of the unlawful controlled substance activity for each defendant was foreseeable by co-defendants working in the same pharmacy.

    a.   Wiley and Essett, as co-workers at I-10 East are jointly and

severally liable.[2]

     b.    Combs and Brown, as co-workers at Mason Road, are jointly and severally liable.

14.    With the exceptions noted in paragraph 13, no other defendants shall be jointly and severally liable.

## Controlled Substances Violations

15.    The Court concludes based on the evidence presented at trial, the jury verdict, the Court's findings of fact, and applicable law that:[3]

     a.    Achobe is liable under 21 U.S.C. § 853  for $25,560.00

     b.     Combs and Brown are jointly and severally liable under 21 U.S.C. § 853 for $243,500.00.

     c.    Otufale is liable under 21 U.S.C. § 853 for $1,122,175.00.

     d.    Wiley and Essett are jointly and severally liable under 21 U.S.C. § 853 for $374,745.00.

---

[2]Wiley and Essett had extensive dealings with Stella Link Pharmacy, which filled Herpin prescriptions for 6,752 pints of promethazine and 6,158 bottles of hydrocodone. Accordingly, the Court could reasonably determine Wiley and Essett are liable for proceeds of Stella Link Pharmacy's unlawful activities.

[3]The amounts and properties all Defendants shall be required to forfeit are laid out *infra* paragraphs 21 and 22 of these Conclusions of Law and the Preliminary Order of Forfeiture issued concurrently with this Order.

16.     The Court notes that the amounts in paragraph 15 are conservative

estimates based on the calculations set forth in the findings of fact.

Money Laundering Violations

17.     The Court concludes based on the evidence presented at trial, the jury

verdict, the Court's findings of fact, and applicable law that:

a.      Achobe is liable under 18 U.S.C. § 982(a)(1) for $6,860.60

i.      These proceeds are the property involved in Counts 20

- 25.

b.      Combs and Brown are jointly and severally liable under 18 U.S.C.

§ 982(a)(1) for $169,038.02

i.      These proceeds are the property involved in counts 26

- 42.

c.      Otufale is liable under 18 U.S.C. § 982(a)(1) for $75,793.48.

i.      These proceeds are the property involved in Counts 12

- 19.[4]

---

[4]The United States avers, and the Court agrees, the United States is entitled to only one recovery and the amounts for Achobe, Combs and Brown, and Otufale are subsumed within the property subject to forfeiture for the controlled substances violations.  As noted above, Defendants shall be required to forfeit those amounts and properties listed *infra* in paragraphs 21 and 22 of these Conclusions of Law and the Preliminary Order of Forfeiture issued concurrently with this Order.

d.      Wiley and Essett are jointly and severally liable under 18 U.S.C. § 982(a)(1) for $517,314.37.

       i.      These proceeds are the property involved in Counts 43 - 72.

e.      Wiley is liable under 18 U.S.C. § 982(a)(1) for $275,000.

       i.      These proceeds are the property involved in Counts 73 - 75.

f.      Essett is liable under 18 U.S.C. § 982(a)(1) for 233,339.71.

       i.      These proceeds are the property involved in Counts 76 - 82.

Property

18.     The Court determines based on the evidence presented at trial, the jury verdict, the Court's findings of fact, and applicable law, that the following properties are subject to forfeiture under 18 U.S.C. § 982(a)(1):

a.      13711 Cypress Pond Circle, Cypress, Texas 77429 legally described as Lot Six (6), Block Four (4), Lakewood Oaks Estates, Sec. 2, Harris County, Texas, together with all improvements and appurtenances thereon.

b.      3106 Spring Ridge Drive, Manvel, Texas 77578 legally described

30

as Lot Four (4), Block Two (2), Silvercreek, Section 3 (A0415

ACH & B), Brazoria County, Texas, together with all improvements

and appurtenances thereon.

Forfeiture

19.     Given the foregoing, the United States is entitled to money judgments on

the controlled substance convictions in the following amounts:[5]

a.      Achobe                          $25,560.00

b.      Combs and Brown                 $243,500.00
        (Joint and Several)

c.      Otufale:                        $1,122,175.00

d.      Wiley and Essett                $374,745.00
        (Joint and Several)

20.     Given the foregoing, the United States is entitled to money judgments on

the money laundering convictions in the following amounts:

a.      Achobe                          $ 6,860.60

b.      Combs and Brown                 $169,038.02
        (Joint and Several)

---

[5]The Government has not submitted figures for Craft.   Accordingly, Craft's
forfeiture liability shall be $0.

|     |                                      |              |
|-----|--------------------------------------|--------------|
| c.  | Otufale:                             | $75,793.48   |
| d.  | Wiley and Essett (Joint and Several) | $517,314.37  |
| e.  | Wiley                                | $275,000.00  |
| f.  | Essett                               | $233,339.71  |

21. The Court concludes that, with respect to the figures in paragraphs 19 and 20, the United States is entitled to only one money judgment from each Defendant.[6]   Accordingly, when the United States recovers from a defendant the amount of the larger judgment in paragraphs 19 and 20, that Defendant's obligation to the United States is satisfied.  Each Defendant's liability is limited to the larger judgment in paragraphs 19 and 20.

22. Moreover, the following properties are subject to forfeiture:

a. 13711 Cypress Pond Circle, Cypress, Texas 77429 legally described as Lot Six (6), Block Four (4), Lakewood Oaks Estates, Sec. 2, Harris County, Texas, together with all improvements and appurtenances thereon.

---

[6]With the exception of Wiley and Essett, the controlled substances amount is larger than the money laundering.  The money laundering for all defendants except Wiley and Essett is subsumed within the controlled substances amounts.

    b.      3106 Spring Ridge Drive, Manvel, Texas 77578 legally described as Lot Four (4), Block Two (2), Silvercreek, Section 3 (A0415 ACH & B), Brazoria County, Texas, together with all improvements and appurtenances thereon.

SIGNED at Houston, Texas, on this 1st day of February, 2006.

_____
DAVID HITTNER
United States District Judge